Case, Monterey Coal Company v. Industrial Commission, 4100752. Counsel, please. Please report, Mr. Muller. My name is Bruce Besore and I represent Scott Biggs. This case went to arbitration in 2008, and the arbitrator concluded that Mr. Biggs suffered from pneumoconiosis and early COPD, and that they were caused in whole or in part by mining or mine dust exposure. He found that the disability was present within the one-year time frame because he was diagnosed with pneumoconiosis prior to leaving mining. The arbitrator also found that adequate notice was provided and he was awarded 20%. In 2009, the commission affirmed and adopted the arbitrator's decision with a unanimous panel. In 2010, the circuit court reversed the commission's decision as being against the manifest weight of the evidence. This appeal filed. The question before the court is whether the decision of the commission was against the manifest weight of the evidence. It was not. And I'll take about six or seven minutes and address the manifest weight on each of the issues. On the issue of disease, the commission found Dr. Cohen to be more persuasive. He's the most qualified pulmonologist in the record. He's the only bee reader pulmonologist in the record. And his opinion was backed up by the NIOSH bee readers and bee reader radiologists, Dr. Alexander. The commission also noted that he isn't paid for his black lung exams or for his deposition. In addition, the treatment records of Dr. Cohen, the records of Dr. Sudholz, Dr. Muth, Dr. Shea, and the Clinton County Rural Health Clinic records all have references to black lung or pneumoconiosis. In addition, didn't Dr. Alexander interpret the test film to indicate the claimant suffered from coal miners' pneumoconiosis? Dr. Alexander did. As well? Yes. Thank you. Now, Monterey's largest single argument is about the CT scans, but it's up to the commission to pick the tests and the doctors they rely on. Dr. Tudor admitted that a high-resolution CT with one millimeter slice is best for pneumoconiosis, but his own report said that the CT was standard. One conclusion would be that Dr. Tudor wasn't very interested in actually finding pneumoconiosis, but the better conclusion is that one of the problems with using a CT scan in black lung cases is that we don't have any approved standards for the equipment used to take the CTs, the equipment used to view the CTs, and there aren't any standard films approved by NIOSH for the radiologists to compare the CTs to. In fact, one of the biggest things about a CT scan that makes it good for treatment purposes but makes it unreliable for litigation purposes is that, as Dr. Tudor said, quote, you can change the algorithms and adjust it so that you can detect certain disease processes or abnormalities better. Well, common sense says that if you can enhance it for certain findings, you can desensitize it for others, and Dr. Tudor said that there wasn't anything in his CT report that would tell you what the settings on the CT were. You couldn't tell how sensitive it was or what it was sensitive for. And the treatment CT had the same infirmity. Dr. Tudor said he didn't even know how thick the slices were. And last, Dr. Tudor said that even with a high-resolution CT scan, the slices should be one millimeter thick and taken at 10-millimeter intervals, which would mean that you'd get a resolute image of 10% of the lung and, by definition, no image at all of 90% of the lung. With a plain old X-ray, you have consistency. One picture, always made the same way, showing all of the lung. And you have B-reading sample films to compare it to. At any rate, with all that in mind, it's up to the commission to decide how much weight to put on the radiographic studies.  Mr. O'Shea, what do you make of Monterey's argument that the pulmonary testing revealed him to claim it to be functioning near or within the normal range? What's your take on that? Well, there were a number of pulmonary function tests. The truth is they weren't that far apart. When Dr. Cohen tested him, he found there to be an obstructive defect, but it was mild. Nothing to brag about. Later testing, it can be argued, as Monterey did, that that showed to be normal. But I think when the commission gets a hold of this, instead of looking at seven tests, they look at two doctors. They had Dr. Cohen and Dr. Tudor. And Dr. Cohen had a reasoned, rational, medically supported opinion for obstructive disease. Dr. Tudor thought there wasn't. And they chose Dr. Cohen. If that's the answer you're looking for. Now, regarding that COPD, Dr. Cohen diagnosed it based on the ratio of the FBC to the FBB1. And Dr. Tudor admitted there was a decline in pulmonary function testing between Dr. Cohen and his testing. He said that Mr. Biggs had sufficient exposure to coal mine dust to cause COPD. And Mr. Biggs named the three supervisors he complained to about his breathing problems while he was still working. And there are treatment entries showing diagnoses, symptoms, and prescription medication that are consistent with obstructive lung disease. There is more than enough evidence in this record to support the commission's decision. Now, once the commission found pneumoconiosis, there was no 1F defense. Because both Dr. Alexander and the government bee reader found pneumoconiosis on an x-ray that was taken while he was still working. The same thing is true for disabling. Once the diagnosis of pneumoconiosis is made, there is disablement by definition. Even Dr. Tudor said that lung disease affected by pneumoconiosis can't function. In addition, both Tudor and Cohen said that if a miner has pneumoconiosis, he shouldn't have any further exposure to coal mine dust. So, Mr. Biggs is disabled by both halves of the definition of disablement in the OB Act. The commission decision on disablement is not against the manifest way to the evidence. On the issue of notice, notice was given with the filing of the claim. It then became Monterey's burden to show undue prejudice. But there isn't any evidence of prejudice in the record. Monterey says it didn't get to have Mr. Biggs examined before the claim was filed. But it waited for a year after it got notice before it set Dr. Tudor's exam. And it didn't set Dr. Tudor's exam until 10 months after Dr. Cohen's claim. It could have had the NIOSH x-ray read by a radiologist. It could have deposed treaters. It could have called co-workers or supervisors. But it didn't do any of that. It doesn't have to. But Monterey is asking the court to presume prejudice. And there isn't any reason to believe that an earlier exam could have improved Monterey's position. All of us experts said, no disease, no disablement. It couldn't have been any more negative if the exam had been earlier. Their defense is that he never had any work-related lung disease. How could an earlier exam have made any difference? Now, the two purposes of the notice provision are to allow for prompt medical attention and to allow for investigation of the accident. But there isn't any treatment or cure for pneumoconiosis. And Monterey doesn't need an investigation to find out there's coal dust in his coal mine. And last, even if there were substantial prejudice, the act says the commission may, at its discretion, bar the claim. The commission did not decide to bar the claim within its discretion. And there's no evidence of an abuse of discretion. And the last, the final issue, is the extent of the award. Dr. Cohen's testing showed obstruction. The chest x-ray showed the tissue damage, which caused an impairment in function. The treatment records show pulmonary concerns and medications. And Dr. Tudor's PFTs showed there was a decline in function after Dr. Cohen's testing. The commission is to be given substantial deference on this issue and their support in the record court's decision. No part of the commission's decision is against the manifest way of the evidence. And I ask the court to reverse the decision of the circuit court and reinstate the award. Thank you. Thank you. Counsel, please. Being pleased to report, Mr. McSore. Bob Muller on behalf of Monterey Coal Company. First of all, although you are hearing these cases this week for three days, one thing I want to point out with regard to manifest way to the evidence, complete deference to the commission decision is not required. And that is exactly what happened in this case, and that's exactly what Judge Neal did. Now, for starters, I wanted to address the CT scan issue. And, I mean, I think it's really important as to whether this guy has evidence of co-worker's pneumoconiosis or not because both Dr. Cohen and Dr. Tudor indicated that it's a better tool for diagnosing it. Now, having both of those experts saying that, the only experts that were asked the question, the arbitrator should have taken that into consideration, said something about the CT scan results in his conclusion. He did not do it. And, in addition to those doctors, we have Dr. Sudholt, the guy's treating pulmonologist, who indicates in her records that there was nothing significant on the CT scan. There are three reports from the CT scan, from three CT scans. The first one was ordered by Dr. Sudholt. That was read by the radiologist and makes no mention of any co-worker's pneumoconiosis. Dr. Sudholt indicates there's no significant abnormality on the CT scan. The next one's done by Dr. Tudor's evaluation. He and the radiologist both indicate there's no evidence of CWP on those films. The third one is Dr. Bierman's interpretation. Again, no mention of CWP. Dr. Sudholt's mention after that is no radiographic findings of significance. The arbitrator, I think, was compelled to consider those interpretations, that CT evidence, in reaching a conclusion with regard to the presence or absence of CWP. He obviously did not. And I think that, when we take what both pulmonary specialists said about the CT scans being a better tool, the interpretations of those scans, and the comments of his treating pulmonologist, the arbitrator's determination of CWP has to be considered against the manifest weight of the evidence. Counsel, would you acknowledge there's conflicting medical evidence in this record? Oh, absolutely. Absolutely. So keeping that in mind, and the ultimate issue is whether or not there's sufficient evidence in the record to support the commission's decision, how do you get around the argument that it was up to the commission to resolve the conflicting evidence, determine which witnesses were more credible, and that's their function? Right. I don't think this is a question of anybody's credibility. I don't think it's a question of which doctor has better credentials. Well, it's a question of weight. I mean, they're entitled to believe Cohen over Tudor, aren't they? Yes, absolutely. And if that were all we were dealing with, I probably wouldn't be here. You might be here anyway, I have a feeling, but you won't go anywhere. Probably as well. The CT scan is the important thing. Dr. Cohen acknowledged how important it was in diagnosing interstitial lung diseases such as CWP, but he never saw a CT scan. He never saw the results of any of the CT scans. His deposition was taken in November of 2005. It was a month after that first CT was done, but there's no way he got that, and obviously he didn't testify about it. So it's not a matter of weight of Dr. Tudor's testimony versus Dr. Cohen's. It's a matter of the CT scan. If it's a better tool, why aren't we looking at it? I say we, but why isn't the arbitrator looking at it? Why isn't that in his decision that he just says he follows what Dr. Cohen said, but Dr. Cohen said nothing about the CT scans except it was a better tool? Will you make it Alexander's report that he looked at the film and said that the claimant suffered from co-workers pneumoconiosis? I'm sorry? Alexander looked at the film, the notice was sent. Is that relevant at all? I don't want to say that any evidence is irrelevant, Your Honor, but again I go back to the CT scan with both the pulmonary specialists saying it's a better tool for diagnosing. We have evidence on both sides with x-ray interpretations. But both doctors say, I say both, but Cohen and Tudor both say the CT scan is the better tool. So why don't we look at those findings? Why doesn't the arbitrator look at it? We can, but then according to you, if you carry your logic out, then the CT scan should be controlling. That should be the end of the ballgame. Right? That's sort of the edge of your argument. It depends. I mean, in this case, that's exactly what I'm saying, because all the CT interpretations were negative for CWP. If there had been a positive interpretation of the CT for CWP, you probably wouldn't have been here. But if it's the best tool that we have in this case, then the interpretations of it should carry the day. The COPD. I asked Dr. Cohen, the only abnormal part of the pulmonary function study which led him to diagnose COPD was the ratio. The FEV1 and the FEC were both normal. In fact, over 100% of predicted. He agreed with that, but said because the ratio was 68% on one of his three tests, then the guy had COPD, mild COPD. The problem is, as I pointed out in my brief, he then did a bronchodilator study, and that ratio was normal, within the normal range. There were four subsequent pulmonary function studies done. Every one of the ratios in those four studies, both before and after the bronchodilator, were within the normal range. And those are after. It's not like Dr. Cohen did the last one, and you can say, oh, the guy's fading. Not the case at all. In fact, the last one, he had the best results that I saw of all of 77% ratio and 78% with the bronchodilator. So, maybe he had something going on back in 2005, in January, when Dr. Cohen did it, but it cleared up by the time Dr. Sudholt did something in 2008. But with all of the other exams, with the ratio being normal, I mean, the overwhelming weight of this evidence supports a finding that he didn't have an abnormality on the pulmonary function study, so that there is no diagnosis of COPD. I mean, the overwhelming weight doesn't get much more than this. I mean, sure, he could have had a 5th and 6th pulmonary function study, but this is, to me, like I said, overwhelming, indisputable, whatever term I want to use, it should have been taken into consideration what was found in all these other studies. Obviously, the arbitrator didn't do that. Again, Dr. Sudholt, his pulmonary doctor, indicated in her records, normal pulmonary function study. So, she did a study in 2006, and a couple in 2008. With the overwhelming weight of the evidence being in, that the pulmonary function values this guy has are normal, including the ratio, except for the one old test, I think the arbitrator's finding in that regard is against the manifest weight, and that Judge Deal did the right thing by reversing that. And I think Judge Deal also did the right thing by reversing the determination of CWP that the arbitrator also made. Thank you. Just briefly on this CT issue. You're the commission, you have to make a decision. You have the system that's been recognized forever, the B-reading system that was brought in specifically to determine whether a guy's got black lung. It's an analog X-ray. It's not as clear, as resolute as a CT. But the CT has other problems. There are no standards for the CT. There are no films to look at for the guy to say, And as I said, if I'm going to be treated, I want to know if I've got an abnormality in here, I'm going to want a CT or an MRI, something like that, not an analog X-ray. But this isn't that. This is just a black lung case, and that analog X-ray will give you a picture of the whole lung, see everything. It's got standards to follow, standards for the equipment that's used to take it, and the commission, I think wisely, decided to stay with the accepted means. Now someday, CT may get those other standards. Someday, the Department of Labor and NIOSH may say that's the best for black lung litigation. They haven't yet. When they do, I'll have to come up with a different argument. But as yet, they have not. When they do, you may not be here. Well, you know how much I love to be here. I can't say that. But I can say that if they did that, it would at least change the arguments and change the bargaining. For the COPD, there's a whole bunch of things you've got to take into account when you're the commission. One thing is if you're talking about, oh, the guy had a 77% FEV1 here, and Tudor's was 83, well, that doesn't end it. What prediction equation was Tudor using? What prediction equation was Cohen using? Cohen was using NHANES 3, the National Health and Nutrition Survey, number 3. And that's what the AMA guide, 6th edition, says to use. Dr. Tudor always uses Knudsen. That's an old one. Now if you look at any numbers you get on the FBC or the FEV1, and it's the same number for the minor, but you apply Knudsen instead of NHANES 3, you're going to get a number that's 8 to 10 points higher. So that the doctor himself, in his reasoned medical opinion, looks at the actual obtained number the guy got, not the percent. Laymen look at that percentage, and they can be misled. And after seeing this so many times, I think the commissions figured that out. And they said, we're not going to try to get in and be doctors. We're going to trust Dr. Cohen. We're going to believe him over Dr. Tudor. And that is supported by the record. And again, the only burden is that there's support in the record. I think there is. I ask that you reverse the circuit board and reinstate the award. Alexander found evidence by chest x-ray of co-workers with pneumoconiosis in February of 2002. Is that correct? Yes. Cohen finds it again in January of 2005. Yes. Tudor says that he examined both the x-rays and the CT scan and found no evidence of pneumoconiosis. Did he examine the same x-rays that Alexander and Tudor examined? Yeah. Do we know? The earlier x-rays were not reviewed by the company's experts. The ones that NIOSH looked at and the ones that Dr. Alexander looked at while he was still working, they weren't. And so this is a typical Justice Hoffman question. And the answer is the commission knows which readers always find them negative and which ones find them most often positive. They also know that if you've got it today, you're going to have it forever. So I think that the question is not who took it last, who looked at last x-rays, but do I believe Cohen's reading or the other? I believe Cohen. Thank you. Of course, we'll take the matter under advisement for disposition. Thank you.